# In the United States Court of Federal Claims

Case No. 08-804C
(Filed:  April 27, 2011)
TO BE PUBLISHED

| | | |
|---|---|---|
| ************************************************** | * | I.R.C. §§ 162, 167, 168, 183; |
| | | business deduction; deferred like-kind |
| PETER MORTON, | * | exchange; "unified business |
| *Plaintiff,* | * | enterprise;" separateness of |
| | * | corporations and individual owners; |
| v. | * | profit motive; substantiation of |
| | * | business expenses; qualified |
| THE UNITED STATES OF AMERICA, | * | intermediary safe harbor; actual or |
| *Defendant.* | * | constructive receipt of funds |
| ************************************************** | | |

**Christopher S. Rizek**, Caplin & Drysdale, Chartered, Washington, D.C., attorney of record for Plaintiffs.

**Joseph V. Syverson,** U.S. Department of Justice, Washington, D.C., for Defendant.

**Amelia C. Moorstein**, law clerk.

## OPINION

**BASKIR, Judge**.

This case comes before the Court on Cross-Motions for Summary Judgment. Plaintiff claims he is entitled to a tax refund in the amount of $9,755,483 because Defendant improperly denied business expenses and depreciation deductions, and improperly required Plaintiff to recognize the gain on a purported like-kind exchange involving aircrafts.  Plaintiff contends he may take deductions for the asserted business expenses because his individual business activities and the business activities of his corporate entities are intertwined and should be viewed as a "unified business enterprise."  The parties dispute the business purposes of the individual expenses.

Because categorization of the aircraft transaction as a like-kind exchange is dependent on substantiating these business expenses, the Court must defer ruling on the validity of the like-kind exchange.  Accordingly, the Plaintiff's Motion for Summary Judgment is **GRANTED IN PART and DENIED IN PART**.  The Defendant's Motion for Summary Judgment is **DENIED**.

## I.    Background

### A.    Plaintiff's Businesses

The facts are taken from the Complaint and papers filed by the parties, including the Consolidated Statement of Undisputed Facts (CSUF).  They are undisputed except where noted.  Plaintiff Peter Morton is one of the co-founders of the Hard Rock Café chain, and the creator and developer of the Hard Rock brand.  He has worked in the restaurant, hotel, and gaming businesses from 1971 to the present.

Prior to the years in suit, Plaintiff established the Hard Rock Hotel, Inc. (HRH), a C corporation, which owned and operated the Hard Rock Hotel and Casino in Las Vegas.  He also established several S corporations in which he was the sole or majority shareholder, including Red, White and Blue Pictures, Inc. (RWB), Lily Pond Investments (Lily Pond), and 510 Development Corporation.  RWB owned the real estate underlying some of the Hard Rock Cafes and acted as landlord.  Lily Pond was a holding company that owned all the voting shares and 94% of the total shares of HRH.  HRH owned and operated the Hard Rock Hotel.  510 Development performed marketing, design, public relations, management services, and accounting services for the Hard Rock Hotel.  510 Development was also the employment vehicle for Mr. Morton's staff.  Plaintiff personally performed management services for HRH.  Plaintiff contends that these corporations "facilitated Morton's overall business: the maintenance, exploitation and expansion of the Hard Rock trademark and Peter Morton brand through cafes, hotel-casinos, and casinos."  Plaintiff personally made loans to these entities to facilitate business growth.  He states that all these entities were interrelated and it did not matter which entity he used to conduct any particular business.

Plaintiff sold his interests in the various Hard Rock Cafes around the world in 1996.  After the sale, he retained a royalty-free sub-license to use the trademark in certain geographical areas for hotel-casinos or casinos.  RWB retained a ground lease on the Hard Rock Café in Las Vegas and a reversionary interest in the Café.  The lease specified that the amount of rent RWB could collect was a percentage of the Hard Rock Cafe's net worth.  The grounds of the Café in Las Vegas were adjacent to the grounds of HRH's hotel.  Plaintiff states that their proximity created a feeling of common ownership in the eyes of the public, and Plaintiff still owned all the voting shares and 94% of all shares of HRH through Lily Pond. Plaintiff continued to perform management services for HRH after the 1996 sale.  His salary was designated as a percentage of HRH's gross income.

### B.    Plaintiff's Claims for Tax Refunds

This is a tax refund suit for the tax years 1999, 2000, and 2001 for $9,755,483.  Plaintiff claims that he is entitled to deductions for business use of Gulfstream-III (G-III)

and Gulfstream-IV (G-IV) aircrafts; he also claims he is not required to recognize a gain on the sale of the G-III.  RWB owned the aircrafts.  Mr. Morton states that he decided to title the plane in RWB's name to take advantage of the limited liability protection afforded S corporations.  Plaintiff advanced to RWB all funds used to operate the G-III and G-IV. Plaintiff also advanced funds to 510 Development Corporation to pay the salaries of RWB's flight department which consisted of a pilot, a co-captain, and a flight attendant.

The aircrafts made over 300 flights during the years in suit. Plaintiff was a passenger on nearly all the flights with the exception of the test flights by prospective purchasers of the G-III, the flight to deliver the G-III to the purchaser, a test flight of the G-IV, and a handful of flights chartered by Plaintiff's friends Matthew Vaughn, Gil Friesen, and Steve Tisch.  Plaintiff concedes that many of the flights were taken exclusively for personal purposes.  Plaintiff used the plane to transport family, friends, and girlfriends to vacation destinations such as Argentina, Ecuador, the Bahamas, England, Germany, Cuba, Mexico, France, Peru, the Netherlands Antilles, Florida, Hawaii, Sweden, and the Hamptons, Long Island, New York.

Plaintiff contends that the other flights were for business purposes because they were taken to promote the Hard Rock brand and to conduct business for HRH, were chartered by Plaintiff's friends, or were the test and demonstration flights.  Morton's pilot kept flight logs detailing use of the planes, including the date and time of the trip, the number of passengers, the departure and arrival airports, the time in flight, and the pilots.  Brian Ogaz, Plaintiff's Chief Financial Officer, met with Plaintiff sometime after the trips were completed to determine which uses were personal and which were business-related.  Mr. Ogaz maintained a spreadsheet identifying the various uses.

Plaintiff argues that the plane was used for business purposes when he used it to travel between the Hard Rock headquarters in Los Angeles and the Hotel and Café located in Las Vegas.  He also claims he used it for business purposes when he traveled to other cities in which Hard Rock hotel-casinos or casinos might be built to conduct meetings regarding the possible expansion of his brand.  He asserts that he intended that RWB would own the land for any new hotel-casinos or casinos.

Plaintiff also argues the plane was used for business purposes in the course of his providing consulting services to HRH, such as oversight and supervision of the design and operation of the Hard Rock Hotel.  Plaintiff received a "supervisory fee" in return for this work.  He entered into an agreement with HRH whereby HRH reimbursed him for expenses incurred in connection with these services.  Plaintiff submitted invoices to HRH for travel on the G-III when he flew places to conduct HRH business; the quoted amounts were the estimated costs of commercial airline tickets on the same routes rather than the costs of operating the aircraft.

Plaintiff concedes he was not engaged in the aircraft charter business at any time during the years in suit, but rather entered into a Charter Agreement to reduce some costs in operating the aircraft.  Plaintiff contracted with the charter company Clay Lacy Aviation, Inc. (Clay Lacy).  RWB chartered five flights, all to Plaintiff's friends.

In 1999, Plaintiff sought to exchange the G-III for the G-IV aircraft.  The main reasons for this exchange were concerns about the safety and the level of noise generated by the G-III.  Plaintiff entered into an agreement with a qualified intermediary for the exchange and an escrow agreement with an escrow agent.  The agreement was executed on September 30, 1999, but the escrow agent accidentally and in contravention of the escrow agreement wired funds from the escrow account to RWB.  Mr. Ogaz returned the funds the following day.

## II.    Discussion

### A.    Legal Standards

Summary judgment may be granted only where there are no genuine issues of material fact, and the moving party is entitled to judgment as a matter of law.  RCFC 56(c); *Moden v. United States*, 404 F.3d 1335, 1342 (Fed. Cir. 2005).  A material fact is one that "might affect the outcome of the suit under the governing law."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A genuine issue of material fact exists where the evidence with respect to the material fact in dispute "is such that a reasonable jury could return a verdict for the nonmoving party."  *Id.*  The party moving for summary judgment bears the initial burden of demonstrating the absence of any genuine issues of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).  Once the moving party has satisfied its burden, the burden shifts to the non-moving party to set forth specific facts showing that there is a genuine, triable issue.  *Id.* at 324.

In considering a motion for summary judgment, the Court must believe any evidence presented by the non-moving party.  *See Anderson,* 477 U.S. at 255; *Chiuminata Concrete Concepts, Inc. v. Cardine Indus., Inc.*, 145 F.3d 1303, 1307 (Fed. Cir. 1998).  The Court must also draw all reasonable inferences in the non-moving party's favor.  *See Anderson,* 477 U.S. at 255; *Gasser Chair Co. v. Infanti Chair Mfg. Corp.*, 60 F.3d 770, 773 (Fed. Cir. 1995); *H.F. Allen Orchards v. United States,* 749 F.2d 1571, 1574 (Fed. Cir. 1984) (non-moving party entitled to "all applicable presumptions, inferences, and intendments").

The plaintiff in a refund suit bears the burden of proving that he has overpaid his taxes for the periods in suit and the exact amount of the alleged overpayment.  *See Lewis v. Reynolds*, 284 U.S. 281, 283 (1932); *George E. Warren Corp v. United States*, 135 Ct. Cl. 305, 314 (1956).  To prevail on his Motion for Summary Judgment the taxpayer must not only establish that the claimed expenses were incurred in the

taxpayer's trade or business, but must also show that each of the asserted expenses was in fact a business expense.

B.     Business Deductions

Plaintiff may deduct expenses related to the two airplanes under section 162 of the Internal Revenue Code of 1986, 26 U.S.C. *et seq.* ("Code" or "IRC") ("ordinary and necessary business expenses paid or incurred…in carrying on any trade or business" are deductible) and under Code sections 167 and 168 (allowing a depreciation deduction for "property used in the trade or business") as long as Plaintiff was "engaged in [an activity] for profit" under Code section 183.  The taxpayer does not necessarily need to be actively engaged in selling goods or services; it is sufficient that the taxpayer is "involved in the activity with continuity and regularity and that the taxpayer's primary purpose for engaging in the activity must be for income or profit."  *Commissioner v. Groetzinger*, 480 U.S. 23, 35 (1987).

Plaintiff argues that the aircrafts were used to facilitate multiple business activities engaged in by Plaintiff, RWB, and his other business entities, and that such uses are deductible business expenses.  In other words, he argues that he is permitted to apply the expenses of an asset owned by one entity towards other entities because Plaintiff and the entities all worked towards a common business purpose, and therefore were all engaged in a common activity for profit.  He sets forth a theory that he and his entities operated as a "unified business enterprise."

To determine whether Plaintiff is allowed to deduct expenses for aircraft use, the Court must analyze (1) whether the law permits Plaintiff to treat his companies as a "unified business enterprise" for tax deduction purposes, and (2) if so, whether Plaintiff has substantiated those business expenses he is attempting to deduct.  The undisputed facts support Plaintiff's contention that his entities operated as a unified business enterprise.  However, there are material facts in dispute because the parties have presented conflicting evidence as to the business or personal nature of many of Plaintiff's trips.

i.     Existence of a "Unified Business Enterprise"

Case law supports Plaintiff's "unified business enterprise" theory and would allow him to take deductions for aircraft use that furthers the business purpose of entities other than RWB.  This deduction may be allowed despite the fact that the aircraft is titled in RWB's name, and RWB did not use the aircraft to further its particular profit motive.  As long as Plaintiff used it to further a profit motive in his overall trade or business, the deduction is allowed.

In *Campbell v. Comm'r*, 868 F.2d 833 (6th Cir. 1989), the Court overturned the Tax Court's holding and held that a partnership was engaged in an activity for profit under section 183 when the partnership bought a plane and leased it to a corporation controlled by the partners.  The partners engaged in extensive air travel in furtherance of the corporation's objectives and formed the partnership for the specific purpose of leasing the plane to the corporation.  The Court allowed the taxpayer to take deductions for the partnership's business losses despite the fact that that partnership generated significant tax losses and such losses on its own would negate a profit motive.  Instead, the Court held that "relationship between the partnership and the corporation established the requisite profit motive."  *Id.* at 835.   Significantly, the Court stated,

> The Tax Court overlooked the numerous authorities holding that an individual may arrange his affairs in order to use his assets to make a profit in a corporation and that such economic arrangements do not require an 'either-one-or-the-other' profit motive.  The profit motive in these cases need not be isolated and attributed to just the individual or to just the corporation.  The *entire economic relationship and its consequences are what determine profit motive*."

(emphasis added).  *Id.* at 836.  It further added that "the close relationship between [the corporation] and [the partnership] establishes rather than negates Health Air's profit motive."  *Id.* at 837.

The relationship between the individual taxpayer and the entities in *Campbell* is similar to the relationship between Plaintiff and his entities.  In both cases, the activities of one entity were clearly in furtherance of another entity of similar ownership; the taxpayer purchased the aircraft with the intention of furthering another entity's business purpose.  In *Campbell*, the Court stated that such an intention was indicative of a profit motive that would permit a deduction.

*Kuhn v. Comm'r*, 64 T.C.M. (CCH) 488 (1992) also supports Plaintiff's theory.  In *Kuhn*, the individual taxpayer bought property and rented the land to the taxpayer's wholly owned corporation at below-market rates.  The corporation benefitted substantially from the use of the property while the taxpayer reported losses from the property on his tax returns for six years.  Despite these losses, the Court found that the taxpayer had a profit motive within the meaning of section 183.  The Court in *Kuhn* noted, "While as a rule the law considers an individual and his controlled corporation to be distinct entities (for purposes of liability and taxation, among others), many taxpayers are largely unconcerned with that distinction."  *Id.* at 5.  The Court found it irrelevant whether Plaintiff intended to "benefit directly (individually) or indirectly (through the corporation)" through use of his property.  *Id.*  Either way, the Court held the Plaintiff had a profit objective within the meaning of section 183.  Though in *Kuhn* the taxpayer owned the asset (land) in his own name rather than in another entity's name, as in our

-6-

case, that difference does not make a distinction.  If Plaintiff had titled the aircraft in his name, he would have lost the advantage of limited liability.  And since the income, losses, deductions, and credit of S Corporations are passed on to the individual taxpayer, the outcome would have been the same regardless of whether he titled the aircraft in his or RWB's name.

Other cases show the Tax Court's willingness to acknowledge and accept the inter-relatedness of a taxpayer's multiple business endeavors.  The Tax Court has noted that "although the section 183 analysis with respect to the activities of a subchapter S corporation is applied at the corporate level, a taxpayer's intent is attributable to his wholly owned corporation."  *Abbene v. Comm'r*, 76 T.C.M. (CCH) 444, 5 (1998) (*citing Ballard v. Comm'r,* T.C. Memo. 1996-68; *Sousa v. Comm'r,* T.C. Memo. 1989-581).  Still other cases have allowed taxpayer deductions for payments to one corporation that make possible the continuing operation of other businesses in which the taxpayer is involved, as long as the expenses further the taxpayer's profit motive. *See Goulde v. Comm'r*, 64 T.C. 132 (1975); *Lohrke v. Comm'r,* 48 T.C. 679 (1967).

Defendant counters Plaintiff's theory with *Deputy v. du Pont,* 308 U.S. 488 (1940) and *Moline Properties, Inc. v. Comm'r,* 319 U.S. 436 (1943).  In *DuPont* , the Court disallowed business deductions because it rejected Plaintiff's argument that he was furthering his business of "conserving and enhancing his estate" when he borrowed stock and transferred this stock to new executive committee members.  The stock transaction was initiated when the company decided it would be desirable to give the new committee members a financial stake in the company, but for undisclosed reasons could not execute the sale itself.  Though Plaintiff's action was intended to financially benefit the company, the expenses did not proximately result from the business of the du Pont Company but rather from the taxpayer's own business interest.  The Court stated that it "[did] not permit any such blending of the corporation's business with the business of its stockholders."  *Deputy v. du Pont,* 308 U.S. at 367.

Though this case supports the notion that the Court should preserve the separateness of corporations and their individual owners, there are several distinctions between *Deputy v. du Pont* and our case.  Most importantly, *Deputy v. du Pont* was decided in 1940 and the entity at issue was a C corporation with many stockholders. The development of S corporations and other newer types of business entities has changed individuals' relationships with corporations; in an S corporation, the corporation is essentially the individual owner(s).  The taxpayer in *Deputy v. du Pont* owned 16% of the stock in the company whereas Plaintiff wholly owns or is a large majority holder of all the entities at issue.  The purported business purpose in *Deputy v. du Pont* of "conserving and enhancing [Plaintiff's] estate" is unrelated to du Pont's business activity in investment and realty, while Plaintiff's business purpose in traveling to promote the Hard Rock and Morton brands is directly related to the business purposes of all his entities- - to further the Hard Rock and Morton brands.

*Moline Properties, Inc. v. Comm'r* supports Defendant's argument that a shareholder must be treated separately from his corporation.  In *Moline Properties,* an individual shareholder bought property and conveyed it to a corporation in which he was the sole shareholder.  The corporation was originally created as a security device at the suggestion of a creditor, and the taxpayer's stock in the corporation was transferred to a voting trustee appointed by the creditor.  The Court held that the taxpayer could not treat the gain on sales of the real property as his own because the corporation was "clearly not Thompson's alter ego and his exercise of control over it was negligible;" and because the taxpayer corporation had "a tax identity distinct from its stockholder." *Moline v. Comm'r,* 319 U.S. at 440.

Again, there are important distinctions between *Moline Properties* and the facts in our case.  *Moline Properties* was decided in 1943, before the formation of S Corporations.  The taxpayer in *Moline Properties* was trying to avoid a corporate-level tax (in addition to the shareholder-level tax), whereas in Plaintiff's case, the corporation is only taxed on the individual level and is not avoiding any other level of taxation.  The fact that the *Moline Properties* court stresses the corporation was not the "alter ego" of the taxpayer actually supports an outcome in Plaintiff's favor: Plaintiff's entities are "alter egos" of Plaintiff; they all have the same business purpose.  Overall, the cases cited by Plaintiff are more timely and more on point than those cited by Defendant; the Court is convinced of the soundness of Plaintiff's unified business enterprise theory.

ii.     Plaintiff's Entities As a Unified Business Enterprise

Undisputed facts support the conclusion that Plaintiff's entities were intertwined and formed a unified business enterprise that operated for profit-making purposes.  Though Plaintiff sold his ownership of the Cafes in 1996, he retained an interest in the Hard Rock trademark that allowed him to sublicense the trademark to hotels or hotel-casinos.  CSUF ¶ 181.  He had an interest in promoting the overall Hard Rock brand so that hotels and casinos would license the trademark.  Because he still retained an interest in the Hard Rock brand, his S corporations worked towards furthering the promotion of the brand for Plaintiff's business benefit.  He also had an interest in developing new hotels that would sublicense the brand.  Plaintiff intended that the land on which these hotels would be built would be owned by RWB.  Pl. Mot. Summ J. 4.

Since he was personally responsible for managing HRH and his salary was dependent on HRH's gross income, the taxpayer had an interest in making sure the Hard Rock brand thrived.  CSUF ¶ 131.  Plaintiff stopped submitting travel invoices to HRH after September 1999 in order to improve HRH's financial condition.  CSUF ¶ 125.  Plaintiff thus compromised his own finances to benefit his corporate entities. 510 Development performed various services for the hotel and paid the salaries of employees who oversaw the operations of the other entities.  CSUF ¶¶ 8, 139.

Finally, the fact that both Plaintiff's salary from HRH and the rent collected by RWB from the Las Vegas Café depended on their respective performances shows that these entities were intertwined with each other and with Plaintiff's profit motive.  CSUF ¶¶ 131, 214.  The Hard Rock Hotel, owned by HRH, and the Hard Rock Café were located adjacent to each other.  CSUF ¶ 184.  Although the two were separately owned, they created an appearance of common ownership.  Plaintiff's work for HRH and RWB benefited both by promoting the overall brand.  Plaintiff's efforts were thus geared towards creating revenue for all the entities and for himself.

### iii.    Substantiating the Expenses

Given that Plaintiff may impute his business activities and the business activities of one entity to his other entities, the Court must still examine whether the evidence shows that the aircraft expenses were for legitimate business purposes.  The facts are in dispute.  Defendant contests the purpose of many of the trips, and specifically takes issue with Plaintiff's trips to the Hamptons because his children, girlfriends, and friends of his children traveled with Plaintiff on the aircraft and stayed with Plaintiff at his vacation homes.  Def. Mot. Summ J. 10.  RWB kept flight logs that identified the date and time of the trip, the number of passengers, the departure and arrival airports, the time in flight, and the pilots.  CSUF ¶ 162.  However, RWB did not keep systematic records of the identity of the passengers on its flights nor the reasons why any passengers were on its flights.  CSUF ¶ 163. The lack of information about the people included on the trip makes it difficult to say at this point definitively that the flights were or were not for business purposes.

Though Plaintiff met with his accountant sometime after the trips to categorize them as "personal" or "business," CSUF ¶ 231, the Court cannot definitively say that these meetings were sufficiently contemporaneous to regard these categorizations as conclusive.  Plaintiff said little at oral argument to enlighten the Court about the process of determining the business or personal nature of the trips.  Because the Court is unconvinced of Plaintiff's categorizations, it defers judgment on the nature of the individual trips.  The Court also must defer a determination as to whether depreciation deductions are allowed because this determination is dependent on substantiating the business usage of the aircrafts.

### C.    Like-Kind Exchange

Plaintiff seeks to treat the sale of his G-III aircraft and subsequent purchase of the G-IV aircraft as a like-kind exchange under section 1031.  I.R.C. § 1031(a)(1) states,

> No gain or loss shall be recognized on the exchange of property held for productive use in a trade or business or for investment if such property is exchanged solely for property of like kind which is to be held either for productive use in a trade or business or for investment.

Specifically, Plaintiff sought to effect a deferred like-kind exchange in which the like-kind property is not simultaneously exchanged.  The Code requires that the replacement property be identified within 45 days and received within 180 days after transfer of the relinquished property."  I.R.C. § 1031(a)(3).  There are specific rules for effecting a valid like-kind exchange.  Treas. Reg. § 1.1031(k)-1(f)(1) states,

> If the taxpayer actually or constructively receives money or other property in the full amount of the consideration for the relinquished property before the taxpayer actually receives like-kind replacement property, the transaction will constitute a sale and not a deferred exchange, even though the taxpayer may ultimately receive like-kind replacement property.

There is a "safe harbor" to prevent the taxpayer from actually or constructively receiving money or property. Treas. Reg. §1.1031(k)-(1)(g)(4).  This "qualified intermediary" safe harbor states that a taxpayer may appoint a qualified intermediary to receive funds from the sale of property, and this intermediary will not be considered an agent of the taxpayer.  The requirements are that (1) the taxpayer assigns his rights under the sales contract to a qualified intermediary, Treas. Reg. §1.1031(k)-(1)(g)(4)(v), (2) the taxpayer gives written notice of the assignment to all parties of the sales contract on or before the sale of the relinquished property, *Id.*, and (3) the taxpayer limits his rights to receive, pledge, borrow, or otherwise obtain the benefits of the money held by the intermediary.  Treas. Reg. §1.1031(k)-(1)(g)(4)(ii).  The taxpayer must meet all the requirements of the section in order to avoid actual or constructive receipt of funds.

Defendant acknowledges that Plaintiff abided by these requirements and would have effected a valid like-kind exchange but for the accidental placement of funds into RWB's account instead of the escrow agent's account.  *See* Def. Mot. Summ J. 19-21.  Defendant stresses that before the funds were placed in escrow, the money was deposited into RWB's checking account; thus Defendant contends that because RWB had possession and control over the funds, Plaintiff had "actual receipt" of them.  Def. Mot. Summ. J. 45.

We disagree that an accidental transfer followed by an immediate return of funds would constitute actual or constructive receipt.  Significantly, Plaintiff was bound by contract not to "receive, pledge, borrow or otherwise obtain the benefits of the Exchange Value" for at least 45 days.  Pl. Mot. Summ J. 36.  Legally, he could not do anything but return the funds to the proper account.  If he had done anything other than return the funds, he would have been liable for conversion, or even theft.

Additionally, Plaintiff should not be penalized for another's mistake when he took every step to validly effect a deferred like-kind exchange. Plaintiff complied with all the requirements of the qualified intermediary safe harbor over which he had control; he did not have control over the mistaken actions of a third party.  Because he complied with

the requirement in all other aspects, we conclude that he validly effected a deferred like-kind exchange.

Though Plaintiff's actions meet the requirements of the safe harbor, the Court cannot allow a refund until Plaintiff convinces the Court that the aircrafts were actually used for "productive use in a trade or business."  As stated in the previous section, the Plaintiff has not sufficiently substantiated the business or personal nature of the individual trips.  Because the aggregation of these individual trips would indicate whether the aircrafts were used for productive use in a trade or business, the Court defers judgment on the like-kind exchange until the parties present further evidence on this issue.

**III.   Conclusion**

**For the foregoing reasons, Defendant's Motion for Summary Judgment is DENIED, and Plaintiff's Motion for Summary Judgment is GRANTED IN PART and DENIED IN PART.**

**The parties are ordered to file a Joint Status Report proposing further proceedings no later than June 20, 2011.**

**IT IS SO ORDERED.**

**s/ Lawrence M. Baskir**
**LAWRENCE M. BASKIR**
**Judge**